IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ADAM GAUNTT,<br><br>    Plaintiff,<br><br>v.<br><br>STOCKX, LLC,<br><br>    Defendant. | Civil Action File No.<br><br>_____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Adam Gauntt ("Mr. Gauntt" or "Plaintiff") files this Complaint against his former employer, Defendant StockX, LLC ("StockX" or "Defendant"), as follows:

**STATEMENT OF CLAIMS, PARTIES, JURISDICTION, AND VENUE**

1.

This is an action for unlawful race discrimination in employment in violation of 42 U.S.C. § 1981 ("Section 1981") and 42 U.S.C. § 2000e, Title VII of the Civil Rights Act of 1964 ("Title VII").

2.

StockX is a foreign limited liability company with its principal office in Detroit, Michigan and a Georgia-based office in Douglasville. StockX may be

served with process through its Registered Agent, United Agent Group Inc. at 2985 Gordy Parkway, 1st Floor, Marietta, Georgia 30066.

3.

Mr. Gauntt was an employee of Defendant as that term is defined under Section 1981 and Title VII.

4.

This Court has personal jurisdiction over the parties and subject matter jurisdiction over all claims asserted by Mr. Gauntt.

5.

Venue is proper because the acts, events, and occurrences giving rise to Mr. Gauntt's claims took place within this judicial district and division.

## FACTUAL BACKGROUND

6.

StockX is an online marketplace for Gen Z and millennial consumers and a clothing reseller, focusing on designer sneakers or basketball shoes and similar clothing that targets the urban and urban music communities for its sales demographic.

7.

Mr. Gauntt served as the Director of Operations at StockX's Georgia sales and distribution facility. He is Caucasian or White.

8.

Almost one hundred percent (100%) of the StockX workforce employed at its Atlanta facility are African American or Black.

9.

Mr. Gauntt served as Director of Operations of the Atlanta facility during the racial inequality marches and demonstrations that erupted across the nation after the police officer killings of George Floyd, Breonna Taylor and others during the Spring and Summer of 2020.

10.

Following these protests and marches, in a Board meeting in late May 2020, the Chief Executive Officer of StockX, Scott Cutler, publicly expressed his concern for what he claimed was the unacceptable "lack of diversity" among the management of StockX during management meetings.

11.

On June 3, 2020, Mr. Cutler and StockX's Vice President of Global Diversity and Inclusion, Marlin Williams, an African American, convened a

company-wide Google meeting during which both men expressly stated the company must and would immediately increase the racial diversity within StockX's managerial leadership team.

12.

Shortly after the meeting on June 3, 2020, Mr. Gauntt's supervisor, Derrick Register, who is Black or African American, directly questioned Mr. Gauntt about his views on the racial issues that were dominating the news cycles on a daily basis. He also voiced his own views and past experiences with racism.

13.

Barely one month later, Mr. Register again spoke with Mr. Gauntt on July 17, 2020, shortly before Mr. Gauntt was leaving for a pre-scheduled and approved summer vacation.

14.

Mr. Register informed Mr. Gauntt that he wanted to discuss "office vibe."

15.

The "vibe" of each StockX office facility is derived from a vague metric based on responses to a periodic anonymous online survey by facility employees.

16.

Because the fact the COVID-19 pandemic was raging and social unrest was gripping the nation, the Atlanta office unsurprisingly received a lower "vibe" score than it had previously been rated in earlier surveys.

17.

Prior to the pandemic, the Atlanta facility had the highest survey scores for "vibe" among the StockX facilities.

18.

Mr. Register told Mr. Gauntt that he personally did not believe "vibe" was a proper measure of office culture in Atlanta.

19.

Nevertheless, Mr. Register was acting on directives from his supervisors and directed Mr. Gauntt to work hard to increase the "vibe" in the warehouse moving forward.

20.

Prior to the pandemic, the Atlanta facility had the highest survey scores for "vibe" among StockX facilities. In addition, business was booming for StockX. According to their CEO, the continued pandemic led StockX to a record year in revenue.

21.

Unlike many businesses nationwide, StockX's management decided that the Atlanta facility would not shut down during the COVID pandemic and would continue to operate as an "essential business." StockX required the Atlanta employees to continue to report to work during a time when public health measures put in place by the federal and state governments closed many other businesses.

22.

The Atlanta facility was the only StockX facility in the U.S. that continued with onsite work without a break in operations other than a half-day closing due to an employee testing positive for COVID-19 without any protests or disruptions under Gauntt's leadership.

23.

In comparison, StockX's Tempe, Arizona and Moonachie, New Jersey facilities both experienced violence, including property destruction and employee protests that included work stoppages.

24.

The Atlanta facility was never under any threat of a work stoppage or a strike despite the pandemic and the significant well-publicized racial strife in the Metro Atlanta area.

25.

Prior to the June 3, 2020 mandate to immediately increase diversity originating from the CEO and Vice President of Global Diversity and Inclusion, Mr. Gauntt's performance in his role had been exemplary. He was never the subject of any discipline or corrective action related to his performance.

26.

StockX never gave Mr. Gauntt the opportunity to work towards increasing the "office vibe," thus demonstrating the "vibe" score was merely a pretext to terminate Mr. Gauntt and use that as an opportunity to replace him with an employee that "increased the diversity of the StockX management team" as mandated by the CEO.

27.

On July 17, 2020, seven days after the "vibe" was tallied and a little more than a month after the diversity mandate was issued by the CEO, Mr. Register called Mr. Gauntt while he was on vacation and informed him that StockX was terminating his employment supposedly for poor office "vibe" and "workplace culture."

28.

StockX replaced Mr. Gauntt with a Black or African American employee.

29.

Other StockX facilities received lower "vibe" scores than Atlanta yet the Directors of Operations for such facilities were not removed or terminated.

30.

This termination of Mr. Gauntt came as a complete surprise to several members of the StockX management around the country.

31.

StockX Vice President Tim McCurdy told Mr. Gauntt that he was very surprised by the firing because he had always done a good job.

32.

StockX's Regional Director of Europe in London, Darryl Evans, reached out to Mr. Register to inquire why Mr. Gauntt was fired and was told only that "Atlanta is a hot spot."

33.

Shortly before Mr. Gauntt's termination, Mr. Register had spoken to Darryl Evans after the London Operations Manager was fired and instructed Evans that the London position had to be filled by a "diverse female."

34.

Other non-White or non-Caucasian Directors of Operation at StockX's U.S. facilities had similar or even lower "vibe" scores for their facilities to that of the Atlanta office, but those Directors were not terminated.

## ADMINISTRATIVE EXHAUSTION

35.

Mr. Gauntt's White or Caucasian race was StockX's determining factor in the company's decision to terminate his employment.

36.

Mr. Gauntt filed an EEOC Charge of Discrimination (the "Charge") within 180 days of the unlawful treatment.

37.

Mr. Gauntt received his notice of Right to Sue on July 6, 2021 and is filing this Complaint to assert his claims under Title VII within 90 days of his receipt of the Right to Sue.

## THEORIES OF RECOVERY

### COUNT I: Discrimination in Violation of Title VII

38.

Mr. Gauntt incorporates all of the foregoing allegations in the numbered paragraphs as if fully restated herein.

39.

Defendant subjected Mr. Gauntt to disparate treatment due to his race (White or Caucasian) in violation of Title VII.

40.

The decision to terminate Mr. Gauntt was motivated in substantial part by his race and/or his race was a motivating factor in StockX's decision to terminate his employment.

41.

As a result of Defendant's discriminatory actions, Mr. Gauntt suffered a loss of income and benefits, and he was denied opportunities for advancement. Defendant's actions also caused Mr. Gauntt to suffer other monetary and non-monetary damages, the amount of which shall be determined at trial.

42.

Defendant's discriminatory conduct was willful and intentional, with reckless indifference to Mr. Gauntt's federally protected rights.

### COUNT II: Discrimination in Violation of Section 1981

43.

Mr. Gauntt incorporates all of the foregoing allegations in the numbered paragraphs as if fully restated herein.

44.

Defendant subjected Mr. Gauntt to disparate treatment due to his race and color (White or Caucasian) in violation of 42 U.S.C. § 1981.

45.

The decision to terminate Mr. Gauntt was based on his race and color.

46.

As a result of Defendant's discriminatory actions, Mr. Gauntt suffered a loss of income and benefits, and he was denied opportunities for advancement. Defendant's actions also caused Mr. Gauntt to suffer other monetary and non-monetary damages, the amount of which shall be determined at trial.

47.

Defendant's discriminatory conduct was willful and intentional, with reckless indifference to Mr. Gauntt's federally protected rights.

## **JURY DEMAND**

48.

Plaintiff demands a trial by jury on all claims so triable.

## **NOTICE OF INTENTION TO AMEND COMPLAINT TO ASSERT ADDITIONAL CAUSES OF ACTION**

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Award Plaintiff compensatory damages in an amount reasonable and commensurate with the losses imposed upon him by StockX's unlawful and discriminatory acts, including his pain and emotional distress;

2. Award Plaintiff punitive damages in an amount reasonable and commensurate with the harm done and calculated to be sufficient to deter such conduct in the future;

3. Grant Plaintiff injunctive relief requiring Defendant to reinstate Plaintiff to his position, with no interruption in service;

4. Enter an award of back pay;

5. Award Plaintiff pre- and post-judgment interest at the maximum rates allowable by law;

6. Grant Plaintiff special damages for all out-of-pocket costs and expenses that he would not have incurred but for Defendant's unlawful conduct, including costs incurred in bringing this action and his reasonable attorneys' fees; and

7. Grant such additional relief as this Court deems necessary, appropriate, proper, or just.

Respectfully submitted: October 1, 2021.

*/s/ M. Travis Foust*
A. Lee Parks
Georgia Bar No. 563750
lparks@pcwlawfirm.com
M. Travis Foust
Georgia Bar No. 104996
tfoust@pcwlawfirm.com

**PARKS, CHESIN & WALBERT, P.C.**
75 14th Street, N.E., 26th Floor
Atlanta, Georgia 30309
T: (404) 873-8000
F: (404) 873-8050

*Counsel for Plaintiff*